UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  07 CR 364-4 |
| | ) | |
| LEONARD LEONTE | ) | Judge Wayne B. Andersen |

**GOVERNMENT'S EVIDENTIARY PROFFER**
**SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this proffer, pursuant to Federal

Rule of Evidence 801(d)(2)(E) and United States v. Santiago, 582 F.2d 1128 (7th Cir. 1987), of the

government's evidence supporting the admission of coconspirators' statements at trial.  Counts Four

and Five of the indictment charge that defendant Leonard Leonte engaged in marriage fraud and

obstruction of justice in violation of Title 8, United States Code, Section 1325(c) and Title 18,

United States Code, Section 1505, respectively.

In this submission, the government describes the applicable law, outlines its evidence

establishing the conspiracy among the defendant and others, and sets forth statements that are

admissible against the defendant in accordance with Rule 801(d)(2)(E).

**I.      Governing Law**

**A.      General Principles**

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is

offered against a party" and is "a statement by a coconspirator of a party during the course and in

furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  The admission of a coconspirator

statement against a defendant is proper where the government establishes, by a preponderance of

evidence, that: (1) a conspiracy existed; (2) the defendant and the person making the cited statement

were members of that particular conspiracy; and (3) that the statement was made during the course

and in furtherance of the conspiracy.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987);

United States v. Westmoreland, 312 F.3d 302, 309 (7th Cir. 2002); Santiago, 582 F.2d at 1130-31.

Statements may be admitted under Rule 801(d)(2)(E) even in the absence of a formal

conspiracy charge.  United States v. Cox, 923 F.2d 519, 526 (7th Cir. 1991) (conspiracy charge not

a condition for admission of statements under 801(d)(2)(E)); United States v. Kelly, 864 F.2d 569,

573 (7th Cir. 1989) (rule applies not only to conspiracies but also to joint ventures and a charge of

criminal conspiracy is not required to invoke the evidentiary rule).  Moreover, this hearsay exception

does not require that each member of the venture share a criminal intent for the exception to apply:

> The distinction should be noted between "conspiracy" as a crime and the co-conspirator
> exception to the hearsay rule.  Conspiracy as a crime comprehends more than mere joint
> enterprise.  It also inveludes other elements, such as a meeting of the minds, criminal intent
> and, where required by statute, an overt act. . . .  The co-conspirator exception to the hearsay
> rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of
> agency law. . . .  Its rationale is the common sense appreciation that a person who has
> authorized another to speak or to act to some joint end will be held responsible for what is
> later said or done by his agent, whether in his presence or not. . . .  The substantive criminal
> law of conspiracy, though it obviously overlaps in many areas, simply has no application to
> this evidentiary principle. . . . [I]t makes no difference whether the declarant or any other
> "partner in crime" could actually be tried, convicted and punished for the crime of
> conspiracy.

United States v. Gil, 604 F.2d 546, 549-550 (7th Cir. 1976).

In this Circuit, the preferred way for the government to make its preliminary "coconspirator-

statement" factual showings is by the filing of a pretrial written proffer of the government's

evidence.[1]  See United States v. Centracchio, 265 F.3d 518, 522 n. 1 (7th Cir. 2001); United States v. Haynie, 179 F.3d 1048, 1050 (7th Cir. 1999).

In determining whether a coconspirator statement is admissible pursuant to Rule 801(d)(2)(E), the Court should examine the coconspirator statement itself to decide whether a conspiracy existed and whether the defendant participated in it.  "Bootstrapping" in this fashion is expressly permitted: the statement of a coconspirator may be the predicate for its own admissibility. Bourjaily, 483 U.S. at 180; see also United States v. Zambrana, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (discussing how overall context of coconspirator statements is what makes the statements very reliable as evidence of a defendant's role in a conspiracy).  The evidence used in showing a conspiracy and a given defendant's participation in that conspiracy may be either direct or circumstantial.  United States v. Irorere, 228 F.3d 816, 823 (7th Cir. 2000); United States v. Redwine, 715 F.2d 315, 319 (7th Cir. 1983).

Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule.  See United States v. Shoffner, 826 F.2d 619, 626-7 and n.10 (7th Cir. 1987).  Of course, a defendant's own admissions are obviously and powerfully relevant to establish the factual predicates for the admission of coconspirator statements against him.  See United States v. Potts, 840 F.2d 368, 371-72 (7th Cir. 1987); United States v. Alexander, 741 F.2d 962, 966 (7th Cir. 1984), overruled on other grounds, United States v. Ginsburg, 773 F.2d 798, 802 (7th Cir. 1985).

---

[1]    This Court has substantial discretion in the manner in which it decides to evaluate the admissibility of coconspirator statements. Although the pretrial proffer is the customary procedure, the Court may admit coconspirator statements subject to the government's eventual proof by preponderance of the evidence of the elements required under Fed. R. Evid. 801(d)(2)(E).  See United States v. Doerr, 886 F.2d 944, 967 (7th Cir. 1989).

Further, certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries to be made as to the existence of a conspiracy, and a defendant's membership in it. For instance, a defendant joins a conspiracy if he agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others and knowingly acts in furtherance of that object; it is immaterial whether the defendant knows, has met with, or has agreed with every coconspirator. United States v. Boucher, 796 F.2d 972, 975 (7th Cir. 1986); United States v. Balistrieri, 779 F.2d 1191, 1225 (7th Cir. 1985). Similarly, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); United States v. Towers, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may be found guilty even if he joined or terminated his relationship with core conspirators at different times.[2] United States v. Ramirez, 796 F.2d 212, 215 (7th Cir. 1986); United States v. Noble, 754 F.2d 1324, 1329 (7th Cir. 1985). Even after a conspirator has concluded his active participation in the activities of the conspiracy, the statements of coconspirators will be admitted against him, unless he affirmatively establishes that he has withdrawn from the scheme. United States v. Feldman, 825 F.2d 124, 129 (7th Cir. 1987). To withdraw from a conspiracy, a conspirator must take steps to disavow or defeat the purpose of the conspiracy, either by communicating the fact of his withdrawal to his coconspirators or by informing the authorities of the conspiracy. United States v. Wilson, 134 F.3d 855, 863 (7th Cir. 1998); United States v. Andrus, 775 F.2d 825, 850 (7th Cir. 1985).

---

[2]  A defendant, even if not an "agreeing" member of the conspiracy, may also be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy. United States v. Kasvin, 757 F.2d 887, 889-891 (7th Cir. 1985); United States v. Galiffa, 734 F.2d 306, 309-11 (7th Cir. 1984). There is no requirement that the indictment charge the defendant with aiding and abetting the conspiracy. Kasvin, 757 F.2d at 890.

4

**B.      The "In Furtherance" Requirement**

To establish that a statement was made "in furtherance" of the conspiracy, the government

need only show "some reasonable basis" upon which to conclude that the statement furthered the

conspiracy.  United States v. Zizzo, 120 F.3d 1338, 1352 (7th Cir. 1997); United States v. Stephens,

46 F.3d 587, 597 (7th Cir. 1995); Shofner, 826 F.2d at 628.   The government has a "relatively low

burden of proof on this issue."  Shofner, 826 F.2d at 628 (collecting cases).  Under the reasonable

basis standard, a statement may be susceptible to alternative interpretations and still be "in

furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily,

made to further the conspiracy in order to be admissible under the coconspirator exception.  United

States v. Singleton, 125 F.3d 1097, 1107 (7th Cir. 1997); United States v. Powers, 75 F.3d 335, 340

(7th Cir. 1996);  United States v. Stephenson, 53 F.3d 836, 845 (7th Cir.1995).   Thus, updates on

a conspiracy's progress, Potts, 840 F.2d at 371, and conversations concerning planning or review of

coconspirators' exploits, United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985), are statements

in "furtherance."

As discussed below, the Seventh Circuit has found a wide range of statements to satisfy the

"in furtherance" requirement.

**1.      Statements Made to Execute the Conspiracy**

Statements made by conspirators to conduct the business of the conspiracy and to accomplish

its goals are "classic examples of statements made to conduct and further" a conspiracy.  United

States v. Cox, 923 F.2d 519, 527 (7th Cir. 1991).  Statements such as these, which are "intended to

promote the conspiratorial objectives," are readily admitted pursuant to Rule 801(d)(2)(E). See, e.g.,

United States v. Sinclair, 109 F.3d 1527, 1534 (10th Cir. 1997); United States v. Shores, 33 F.3d

438, 444 (4th Cir. 1994); United States v. DeLuna, 763 F.2d 897, 909 (8th Cir. 1985); United States

5

v. Layton, 720 F.2d 548, 556 (9th Cir. 1983); United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982).

Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. United States v. Monus, 128 F. 2d 376, 392 (6th Cir. 1997); United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); see also United States v. Smith, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. Garlington v. O'Leary, 879 F.2d 277, 284 (7th Cir. 1989).

## 2. Statements Regarding the Conspiracy's Activities.

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. United States v. Ashman, 979 F.2d 469, 489 (7th Cir. 1992). Similarly, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy, United States v. Godinez, 110 F.3d at 454; United States v. Herrero, 893 F.2d 1512, 1527-28 (7th Cir. 1990); Garlington v. O'Leary, 879 F.2d at 283-84; United States v. Van Daal Wyk, 840 F.2d 494, 499 (7th Cir. 1988). Statements to assure that a coconspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. United States v. Buishas, 791 F.2d 1310, 1315 (7th Cir. 1986); United States v. Romo, 914 F.2d 889, 897 (7th Cir. 1990); United States v. Martinez de Ortiz, 907 F.2d 629, 635-36 (7th Cir. 1990).

### 3. Statements to Recruit Conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. United States v. Godinez, 110 F.3d at 454; Shoffner, 826 F.2d at 628. "Conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." United States v. Dorn, 561 F.2d 1252, 1256-57 (7th Cir. 1977); see also Herrero, 893 F.2d at 1528; United States v. Doerr, 886 F.2d at 951; Garlington, 879 F.2d at 283.

### 4. Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener.

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. In United States v. Van Daal Wyk, 840 F.2d 494 (7th Cir. 1988), the government sought to admit statements made by a drug wholesaler to one of his couriers concerning the defendant. The pertinent statements identified the defendant as a dealer of the wholesaler who owed the wholesaler money for cocaine. In addition, the wholesaler had instructed his courier not to deliver any additional quantities of cocaine to the defendant. These statements were held to be in furtherance of the conspiracy and admissible.

The Seventh Circuit has also found that "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." Stephenson, 53 F.3d at 845; United States v. Curtis, 37 F.3d 301, 307 (7th Cir. 1994).

As the Seventh Circuit held in United States v. Pallais, 921 F.2d 684, 688 (7th Cir. 1990):

> [t]he exchange of information is the lifeblood of a conspiracy, as it is
> of any cooperative activity, legal or illegal. Even commenting on a
> failed operation is in furtherance of the conspiracy, because people
> learn from their mistakes. Even identification of a coconspirator by

> an informative nickname . . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. See id.; Van Daal Wyk, 840 F.2d at 499 ("statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A coconspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. United States v. Sophie, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. Garlington, 879 F.2d at 284 (upholding admission of coconspirator's statement to defendant in a murder conspiracy "We're going to take care of him," reasoning that the statement encouraged the defendant to perform his task in the conspiracy). In United States v. Molinaro, 877 F.2d 1341, 1343-44 (7th Cir. 1989), the defendant sought to preclude the admission of statements between conspirators in which they were complaining about a third conspirator's handling of the delivery and payment for narcotics. The defendant argued that these statements were mere idle chatter and not in furtherance of the conspiracy. The Seventh Circuit rejected the defense's position, finding that the statements were made to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy by the third conspirator.

### 5. Statements Relating to the Progress and Past Accomplishments of the Conspiracy.

8

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy.   Potts, 840 F.2d at 371; Molt, 772 F.2d at 368-69.  Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy.  United States v. Doyle, 771 F.2d 250, 256 (7th Cir. 1985).

**6.       Statements to Conceal the Criminal Objectives of the Conspiracy.**

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where ongoing concealment is one of its purposes.  United States v. Gajo, 290 F.3d 922, 928-29 (7th Cir. 2002); United States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987); Xheka, 704 F.2d at 985-86; United States v. Mackey, 571 F.2d 376, 383 (7th Cir. 1978). "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." United States v. Troop, 890 F.2d 1393, 1404 (7th Cir. 1989).

Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy.  See Van Daal Wyk, 840 F.2d at 499.  The use of violence and threats to intimidate the members of a conspiracy and to protect its secrecy are also relevant to and in furtherance of the ongoing conspiracy.  United States v. Markowski, 772 F.2d 358, 366 (7th Cir. 1985).

**C.**        **Statements Admissible Without Regard To The Coconspirator Rule.**

As discussed above, statements that a defendant personally makes are admissible against him as admissions of a party-opponent pursuant to Rule 801(d)(2)(A) without reference to the coconspirator statement rule. See Shoffner, 826 F.2d at 626-627 and n.10. Statements that a conspirator does not make personally, but which he impliedly or expressly authorizes an agent to make in the context of an existing agency relationship are admissible pursuant to Rule 801(d)(2)(D). United States v. Feldman, 825 F.2d 124, 128 (7th Cir. 1987); see also United States v. Gibson, 690 F.2d 697, 701 (9th Cir. 1982); United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978); United State v. AMREP Corp., 560 F.2d 539, 545 (2d Cir. 1977). An agent-principal relationship exists when the agent acts on behalf of the principal and subject to his or her control and if the agent consents to so act. Feldman, 825 F.2d at 129, quoting Southern Pac. Transp. Co. V. Continental Shippers Ass'n, 642 F.2d 236, 238 (8th Cir. 1981).

Similarly, the coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification – an example would be a declaration that is simply an order or a suggestion. See United States v. Tuchow, 768 F.2d 855, 868 n.18 (7th Cir. 1985). Equally importantly, the coconspirator statement rule is not implicated if a statement is not offered in evidence to prove the truth of the matter asserted and, thus, does not constitute "hearsay" as defined by Rule 801(c). United States v. Feldman, 825 F.2d at 127. Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the Bourjaily factual predicates, but with corresponding limiting instructions, where such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. Gajo, 290 F.3d at 929-30; United States v. Herrera-Medina, 853 F.2d 564, 565-566 (7th Cir. 1988); Van Daal Wyk, 840

F.2d at 497-498; Tuchow, 768 F.2d at 867-869; United States v. Magnus, 743 F.2d 517, 521-523

(7th Cir. 1984).

**D.      The Absence of Confrontation Issues with Coconspirator Statements**

No separate Sixth Amendment confrontation issues are posed by the use of a non-testifying

coconspirator's statements which are offered for their truth against the defendant.  This is because

the requirements for admission under Rule 801(d)(2)(E) are identical to "the requirements of the

Confrontation Clause."  Bourjaily, 483 U.S. at 182.  Thus, there are no "constitutional problems"

once Rule 801(d)(2)(E)'s requirements have been met.  Id.; United States v. Ceballos, 302 F.3d 679,

689 n. 2 (7th Cir. 2002); United States v. Singleton, 125 F.3d at 1107-08; see also Idaho v. Wright,

497 U.S. 805, 814 (1990) (Confrontation Clause is not violated where hearsay statement falls within

a firmly rooted hearsay exception).  As a result, in considering the admissibility of proffered

coconspirator statements, the trial court does not consider whether or not the coconspirator-declarant

is "unavailable" or whether there is independent evidence to establish the "reliability" of the

proffered statements.  Inadi, 475 U.S. at 400; Bourjaily, 483 U.S. at 183-84.

This long-standing rule was not affected by the Supreme Court's decision in Crawford v.

Washington, 124 S.Ct. 1354 (2004).  In Crawford, the Supreme Court considered whether to admit

the recorded statement of  the defendant's wife at trial, where she had made the statement to law

enforcement prior to trial.  The wife was "unavailable" at trial by virtue of the state's spousal

privilege law.  Thus the defendant did not have an opportunity either prior to trial or during trial to

cross-examine her.

The Court ruled that admission of the wife's statement violated the Sixth Amendment's

Confrontation Clause, holding that where the government offers at trial hearsay that is "testimonial"

in nature, the Confrontation Clause of the Sixth Amendment requires actual confrontation, i.e.,

11

cross-examination, regardless of how reliable the statements may be. However, the Court recognized that coconspirator statements are a recognized exception to the strictures of the Sixth Amendment because they are not testimonial in nature. Id. at 1367; see also United States v. Hendricks, 395 F.3d 173, 183-84 (3rd Cir. 2005) ("Crawford presents no bar to the admission of the statements of Defendants or their coconspirators made in the conversations with [the CI during a surreptitious recording]."

The Supreme Court's limitation on its decision to cover only those statements that are "testimonial" in nature is what distinguishes that ruling from the evidence the government seeks to admit here. In this case, the government is not seeking to admit any "testimonial" prior statements – i.e., record of interrogation by law enforcement, affidavits, grand jury testimony, depositions and the like. Instead, the government will offer garden variety coconspirator statements such as statements by coconspirators or joint venturers regarding their conversations related to the charged marriage fraud – which statements were made during the course of furthering the conspiracy or joint venture. Because the government does not intend to offer "testimonial" hearsay statements, Crawford is not implicated, and the coconspirator statements may be admitted without offending the Sixth Amendment.

II.     **Government's Proffer of Evidence**

A.     **Background**

The government anticipates that its evidence at trial will establish the existence of a conspiracy related to the charged fraudulent marriage between the defendant and Tammy Daniels. Count Four of the indictment charges that on or about October 18, 2002, defendant, Daniels and Jeremy Starnes knowingly entered into, and aided, abetted and procured the entering into of, a marriage for the purpose of evading provisions of the immigration laws, namely, Title 8, United States Code, Sections 1154 and 1186a, which provisions restrict the availability of legal permanent resident status, applied for on the basis of marriage to a United States citizen, to those foreign nationals who have entered into the marriage in good faith, not in exchange for something of value and not for the purpose of procuring the foreign national's admission as an immigrant, in violation of Title 8, United States Code, Sections 1325(c) and 2.

The government anticipates that its evidence will show that beginning in or about early July 2002, Jeremy Starnes began recruiting Tammy Daniels to participate in a marriage to a European national so that the European national could obtain immigration benefits. Starnes informed Daniels that she would earn approximately $5,000 for agreeing to enter into the marriage. Starnes further explained to Daniels that he worked with two individuals – Individual 1 and Individual 2 – in arranging the marriages.

Daniels initially rejected Starnes' offer. However, by approximately early October 2002, Daniels told Starnes that she was willing to enter into a marriage to a European national in return for money. At Starnes' direction, shortly after agreeing to enter into the marriage, Daniels, Starnes, the defendant, Individual 1 and Individual 2 met at Individual 2's house, where Starnes introduced Daniels to the defendant and explained that the defendant was the person who Daniels would be

marrying. Starnes also described to Daniels and the defendant various aspects of how the marriage would work.

During the meeting, Individual 1, on behalf of the defendant, agreed that the defendant would marry Daniels. Starnes then directed Daniels and the defendant to meet at Chicago City Hall on October 17, 2002, to apply for a marriage license. Starnes directed them to bring their driver's licenses with them. Starnes told Daniels and the defendant that they would then get married on October 18, 2002.

During the morning of October 17, 2002, Starnes called Daniels and directed her to meet him at Chicago City Hall. Daniels agreed. Daniels then went to the building known to her as Chicago City Hall and met on Clark Street with Starnes and the defendant, as well as Individual 4, and Individual 3. While on Clark Street, Starnes directed Daniels and the defendant to enter the building, go downstairs and apply for a marriage license, which Daniels and the defendant did.

After applying for and obtaining their marriage license, Daniels and the defendant returned to Clark Street where Starnes, Individual 3 and Individual 4 were waiting. Starnes told Daniels that he was going to pay her $1,500 cash the next day after the marriage was complete. Starnes further directed Daniels to meet him at Chicago City Hall the following morning and to dress nicely.

On October 18, 2002, Starnes, Daniels, Individual 4 and two women Daniels had never met before, drove to Chicago City Hall. On Clark Street, outside of Chicago City Hall, Starnes, Daniels, Individual 4 and the two women met with the defendant and Individual 3. While outside, the defendant gave Daniels a wedding band and flowers. Daniels and the defendant then posed for photographs taken by Starnes. Additionally, Daniels and the defendant discussed their backgrounds with each other and concocted a story regarding how they met and how long they had been dating,

14

in case the judge who was marrying them asked. Finally, Starnes told Daniels and the defendant that at the end of the ceremony, they should kiss.

Daniels, the defendant, Individual 3 and the two women eventually went downstairs in the building known to Daniels as Chicago City Hall so Daniels and the defendant could get married. Starnes said that he could not attend the ceremony because if he went to too many ceremonies, it would be suspicious.

After the ceremony, Daniels, the defendant and the others went back upstairs where they met up with Starnes. Starnes directed Daniels and the defendant to take a photograph with a photographer who was standing there, which they did. Outside of Chicago City Hall, Starnes stated that everyone should go get brunch and that the meal would serve as the wedding reception. Daniels declined because she had to return to work.

While outside of Chicago City Hall, Individual 3 told Daniels that she and the defendant had to go to a currency exchange so the defendant could get some papers notarized. Daniels agreed to go. Daniels, Starnes, Individual 4 and the two unknown women then drove to the currency exchange. During the drive, Starnes handed Daniels $1,500 cash. Starnes told Daniels that the defendant had given him the money. Starnes further told Daniels that for future payments she would have to deal with the defendant directly. Starnes stated that Daniels should get her remaining payments from the defendant as follows: (a) $1,000 after the defendant received his work permit; (b) $1,000 after Daniels and the defendant were interviewed by immigration officials; and (c) $2,000 after the defendant obtained his "green card."

At the currency exchange, the defendant gave Daniels some papers to sign. The defendant then had the papers notarized. Daniels and the defendant then exchanged telephone numbers.

15

During the weeks, months and years after the marriage ceremony, the defendant and Daniels had several conversations related to their marriage and the steps that needed to be taken to make it look real.  On occasion, the defendant and Daniels met to take photographs, discuss each other's backgrounds and sign leases to make it appear as if they lived together.  Individual 3 and Individual 5 attended some of these meetings.  Daniels' children were also at some of the meetings.  At one of the meetings, Individual 3 suggested how Daniels and the defendant should pose for photographs in order to make it appear as if Daniels and the defendant truly were married.  At another meeting, Daniels told the defendant that she was in a serious relationship, to which the defendant responded that he hoped that the process of the defendant obtaining his green card would be over soon, in case Daniels wanted to get married.

In or about fall 2005, Daniels spoke to Starnes to learn information about the immigration interview that Daniels and the defendant would have to attend before the defendant could obtain immigration benefits.  Starnes told Daniels that he, himself, had attended an immigration interview.  Starnes told Daniels that during the interview she and Leonte should say that everything in their apartment was white and that they should know which way the doors in their apartment opened.  Daniels and the defendant subsequently agreed to do that.

In or about late November 2005, Daniels called Starnes and told him that the defendant's immigration interview had been scheduled for early December.  Daniels told Starnes that she had previously told the defendant that she was not married to anyone else but, in fact, she was.  Starnes asked Daniels if she had a copy of her mother's death certificate.  When Daniels stated that she did, Starnes directed Daniels to give him a copy of the death certificate and stated that he would fix it to make it appear as if her previous husband had died.

16

The defendant and Daniels ultimately attended two immigration interviews with United States Citizenship and Immigration Services. An issue at both of the interviews was the alleged death of Daniels' previous husband. The defendant and Daniels had various conversations regarding the alleged death. The defendant and Daniels also discussed the alleged death with an attorney who had been hired by defendant. In or about July 2006, Daniels told the defendant that her previous husband had not died and that she could no longer go through with trying to make the marriage look legitimate.

### B.    The Existence of a Conspiracy

The evidenced summarized in this submission establishes by a preponderance of the evidence that a conspiracy existed between the defendant, Daniels, Starnes, Individual 1, Individual 2 and Individual 3. As of the the meeting at Individual 2's residence when the defendant and Daniels agreed to marry each other, both the defendant and Daniels had agreed to join the conspiracy. The conspiracy continued until at least July 2006 when Daniels stated that she no longer could go through with assisting the defendant in obtaining immigration benefits.

### C.    Statements Made to Recruit Daniels into the Conspiracy

At trial, the government intends to present Daniels' testimony. The government anticipates that Daniels' testimony will cover the time period from early July 2002 until the date of her arrest in this matter. Portions of Daniels' testimony will cover a time period where Starnes was recruiting Daniels into the conspiracy, but before Daniels actually joined. As such, Rule 801(d)(2)(E) does not apply. Starnes' statements are, nevertheless, admissible as non-hearsay because they are either not statements as defined by Rule 801(a) or not offered for the truth of the matters asserted.

17

**D.**     **Defendant's Statements**

The government anticipates that a large portion of Daniels' testimony will cover the time period after she and the defendant joined the conspiracy. A majority of the statements the government intends to introduce are the defendant's own statements (along with Daniels' corresponding statements to put the conversations in context). Those statements are admissible pursuant to Rule 801(d)(2)(A).

**E.**     **Non-Hearsay Statements**

Numerous statements made by the coconspirators during the course of the conspiracy are admissible as non-hearsay because the statements are either not statements as defined by Rule 801(a) or not offered for the truth of the matter asserted. Statements that fit into this category are various directions given by Starnes and Individual 3's suggestion on how the defendant and Daniels should stage photographs in order to make their marriage look legitimate.

**F.**     **Statements Made During the Course and In Furtherance of the Conspiracy**

The government does not anticipate offering evidence of statements of others made during the course and in furtherance of the conspiracy, which statements fit within the definition of hearsay and which would, therefore, solely be admissible pursuant to Federal Rule of Evidence 801(d)(2)(E). However, to the extent that this Court rejects the proposed bases for admissibility set forth in § II.D and E above, the statements described in those subsections are also admissible pursuant to Rule 801(d)(2)(E) because they were made during the course and in furtherance of the conspiracy.

**III.    CONCLUSION**

The summary provided above is an outline of the evidence the government will introduce to establish that a conspiracy existed involving the defendant and his co-conspirators.  This Court should find, based upon this proffer, that all of the statements at issue are admissible without reference to Federal Rule of Evidence 801(d)(2)(E).  However, to the extent that the Court determines that Rule 801(d)(2)(E) provides the sole basis for admissibility, this Court should find that the proffered statements were made during the course and in furtherance of the conspiracy to obtain immigration benefits for the defendant through his marriage to Tammy Daniels.

Dated: January 31, 2008

                              Respectfully submitted,

                              PATRICK J. FITZGERALD
                              United States Attorney


                         By: Scott R. Drury/s
                              SCOTT R. DRURY
                              CLIFFORD C. HISTED
                              Assistant United States Attorneys
                              219 South Dearborn Street
                              Room 500
                              Chicago, Illinois 60604
                              (312) 353-5300

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

was served on January 31, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR
5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's
system as to ECF filers.

By:     Scott R. Drury/s
        SCOTT R. DRURY
        Assistant United States Attorney
        219 South Dearborn, 3rd Floor
        Chicago, Illinois 60604
        (312) 353-1416